[Cite as *State v. Fair*, 2011-Ohio-3330.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                                   :

    Plaintiff-Appellee                      :                C.A. CASE NO. 24120

v.                                              :                T.C. NO.    08CR4546

MARK A. FAIR                                    :                (Criminal appeal from
                                                                 Common Pleas Court)

    Defendant-Appellant                     :

                                                :

        . . . . . . . . . .

## O P I N I O N

Rendered on the ___1st___ day of ____July____, 2011.

. . . . . . . . . .

KIRSTEN A. BRANDT, Atty. Reg. No. 0070162, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

LYNNE M. FLEMING, Atty. Reg. No. 0078520, 15 West Fourth Street, Suite 100, Dayton, Ohio 45402
    Attorney for Defendant-Appellant

. . . . . . . . . .

FROELICH, J.

{¶ 1} Mark A. Fair was convicted after a jury trial in the Montgomery County Court of Common Pleas of complicity to commit burglary, receiving stolen property, and assault on a peace officer. The trial court sentenced him to an aggregate term of six years in

prison.

{¶ 2} Fair appeals from his conviction and sentence, claiming that his counsel rendered ineffective assistance, that the trial court erred in overruling his Crim.R. 29 motion, that the trial court erred in precluding defense counsel from discussing a lesser related offense during closing argument, and that his convictions for complicity to commit burglary and receiving stolen property should have been merged. For the following reasons, the trial court's judgment will be affirmed in part and reversed in part, and the matter will be remanded for resentencing.

I

{¶ 3} Michael[1] and Jane Maney reside with their adult children, Seth and Stacy,[2] at 300 Southview Avenue in Oakwood. During the morning of November 21, 2008, their home was burglarized.

{¶ 4} According to the State's evidence at the June 2010 trial, at approximately 8:30 a.m. on November 21, 2008, Jane Maney left with Seth and Stacy to take Stacy to work and to run errands. Michael remained in the house and fell asleep in the downstairs den. Jane and Seth returned around 11:30 a.m. They woke Michael, and Michael left for an appointment shortly thereafter. When Seth headed to the stairs leading to the second floor, he heard the sounds of people moving upstairs and objects being dropped on the floor. Seth informed his mother, who also heard sounds upstairs, and the two left the house, leaving their coats and cell phones behind.

---

[1] Michael Maney's first name is Charles, but he is known by his middle name.

[2] At the time of the June 2010 trial, Stacy was 28 years old, and Seth was 24 years old.

{¶ 5} Seth drove them around the block and then down the street to a gas station to use a pay phone to call the police. When the pay phone did not work, they decided to drive to the nearby police station. As they drove, they saw a man running from the direction of their home. The Maneys arrived at the Oakwood police station within a minute and provided a description of the man they had seen to the police.

{¶ 6} Lieutenant Keith Benson heard a dispatch reporting the burglary and the description of the person the Maneys had seen running. Benson quickly responded to the area and noticed a person matching that description standing at the intersection of Far Hills Avenue and Thruston Boulevard (an intersection known as the "Five Points" intersection), which is near Southview Avenue. Benson turned onto Thruston, parked his vehicle, and attempted to stop the man, later identified as Fair. Fair made eye contact with the officer, turned, and ran across several yards. Benson chased Fair on foot, and stopped him by tackling Fair's legs. A fight ensued, and Fair was ultimately subdued when other officers arrived and handcuffed him. Several items of the Maneys' personal property were found in the yard where Fair and Benson had struggled.

{¶ 7} Fair was arrested and taken to the Oakwood police station, where several other items belonging to the Maneys were removed from his pockets. Fair initially informed the officers that he was not "going to tell you anything but my name." However, while there, Fair made several unsolicited statements to Detective Hill and Officer Wilson, including that "he should have never went with those guys," that he "was with Benny Brown and Mike," that "they were driving around and they were doing some stuff," and that he "needed money." Because the struggle between Fair and Lieutenant Benson had caused

bleeding, the officers asked Fair if he would voluntarily submit to have his blood withdrawn at a hospital for testing. Officer Wilson took Fair to Kettering Medical Center.

{¶ 8} While at the hospital, Fair asked to speak with Detective Hill again. Fair was returned to the Oakwood police station. Hill asked Fair what he wanted to say. Fair responded, "You help me out, I'll help you out." Fair stated that he did not commit the burglary, and that he was with Benny and Mike. Fair told Hill that "I fence the property for them." Fair stated, "Benny and Mike steal the property, and they give it to me, and I know how to get rid of it. I stayed in the car while Benny and Mike committed the burglary." After this exchange, Fair was transported to the Montgomery County Jail.

{¶ 9} In December 2008, Fair was indicted with complicity to commit burglary, receiving stolen property, and assault on a peace officer.

{¶ 10} In February 2009, Fair moved to suppress all of the evidence against him, arguing that the Oakwood officers had no reasonable suspicion or probable cause upon which to stop him, that the warrantless search of his person was unlawful, and that he was questioned by the Oakwood officers without a waiver of his rights under *Miranda v. Arizona* (1966), 384 U.S. 436, 478, 86 S.Ct. 1602, 16 L.Ed.2d 694. The trial court held a suppression hearing, following which the parties agreed to submit supplemental briefs.

{¶ 11} Before the trial court ruled on the suppression motion, the parties filed stipulations regarding the admissibility of the evidence. The parties agreed that the Oakwood police officers had reasonable suspicion to make an investigatory stop of Fair and had probable cause to search Fair incident to a lawful arrest. The parties further agreed that certain statements made by Fair at the police station were admissible as spontaneous

statements, while other unspecified statements were not admissible. In light of the stipulations, Fair withdrew his motion to suppress.

{¶ 12} In January 2010, the case was tried to a jury. The jury found Fair guilty of receiving stolen property and assault on a peace officer, but could not reach a verdict on the complicity to commit burglary charge; the trial court declared a mistrial as to that charge. In June 2010, a second jury trial was held on complicity to commit burglary, and the jury found Fair guilty.

{¶ 13} At sentencing, the trial court sentenced Fair to five years for complicity to commit burglary (Count 1) and to one year for receiving stolen property (Count 2). The court indicated that the offenses would merge, but if they did not, the sentences would run concurrently. The court imposed a one-year sentence for assault on a peace officer (Count 3), to run consecutively to the other sentences. The total sentence was six years. In its termination entry, the court merged Counts 2 and 3 (receiving stolen property and assault), and indicated that the one-year sentence would be served consecutively to the five-year sentence for complicity to commit burglary.

{¶ 14} Fair raises four assignments of error on appeal.

II

{¶ 15} We begin with Fair's second assignment of error, which states:

{¶ 16} "THE TRIAL COURT ERRED IN OVERRULING DEFENDANT/APPELLANT'S RULE 29 MOTION FOR ACQUITTAL."

{¶ 17} At the conclusion of the State's case, Fair moved for a judgment of acquittal on the ground that the State failed to prove that he "did anything to aid and abet the burglary

that took place." Fair did not dispute that the Maneys' home was burglarized on November 21, 2008. He argued, however, that there was no evidence that placed him inside the home or on the property and that his presence near the home while in possession of the Maneys' property was insufficient to constitute complicity. Fair further emphasized that his statements to the police supported the view that he had committed receiving stolen property, not burglary. The trial court denied Fair's motion.

{¶ 18} When reviewing the denial of a Crim.R. 29(A) motion, an appellate court applies the same standard as is used to review a sufficiency of the evidence claim. *State v. Thaler,* Montgomery App. No. 22578, 2008-Ohio-5525, ¶14 (citation omitted). "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson,* Montgomery App. No. 22581, 2009-Ohio-525, ¶10, citing *State v. Thompkins,* 78 Ohio St.3d 380, 386, 1997-Ohio-52. When reviewing whether the State has presented sufficient evidence to support a conviction, the relevant inquiry is whether any rational finder of fact, after viewing the evidence in a light most favorable to the State, could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Dennis,* 79 Ohio St.3d 421, 430, 1997-Ohio-372, citing *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d. 560. A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." Id.

{¶ 19} R.C. 2923.03(A)(2) states that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall *** [a]id or abet another in

committing the offense." A person aids and abets the commission of a crime when he advises, supports, assists, encourages or cooperates with the principal offender, and shares the criminal intent of the principal offender. *State v. Johnson*, 93 Ohio St.3d 240, 2001-Ohio-1336. "Such intent may be inferred from the facts and circumstances surrounding the crime." *State v. Whitfield*, Montgomery App. No. 22432, 2009-Ohio-293.

{¶ 20} Viewing the evidence in the light most favorable to the State, we find sufficient evidence to support the conviction for complicity to commit burglary. Jane and Seth Maney testified that they heard the sounds of two or more people inside their home, without their permission, shortly before noon on November 21, 2008. After attempting to call the police from a nearby payphone, they saw a man in dark jeans and a large dark-colored parka with fur around the hood running from the area of their house. Within a short time, the police were notified of the burglary and the person that the Maneys had seen, and an Oakwood officer located Fair, who matched the description reported by the Maneys, at the "Five Points" intersection near the Maneys' home. When Fair was apprehended, several items of the Maneys' personal property were found on the ground where the struggle had occurred, as well as in Fair's pockets. Although Fair claimed the burglary was committed by Benny and Mike, Detective Hill testified that he was unable to locate Benny Brown, and there was no corroboration for Fair's assertion that he merely waited in the car while Brown and Mike "were doing stuff." Taken together, the jury could have reasonably believed that Fair actively participated in the burglary, particularly given that the Maneys heard multiple people in their house and Fair was found running from the area with the Maneys' personal property in his possession.

{¶ 21} As related by Detective Hill at trial , Fair also made statements to Oakwood officers that he "fenced" stolen property for Benny Brown and Mike and that he had remained in the car while those individuals entered the Maneys' home to commit the burglary. Fair had also indicated, however, that he had needed money. Thus, even if the jury believed that Fair had not entered the residence, the jury could have reasonably concluded that Fair had planned the burglary with Benny and Mike due to Fair's need for money. The trial court did not err in denying Fair's Crim.R. 29 motion.

{¶ 22} The second assignment of error is overruled.

III

{¶ 23} Fair's first assignment of error states:

{¶ 24} "TRIAL COUNSEL WAS INEFFECTIVE IN STIPULATING TO THE ADMISSIBILITY OF INCRIMINATING STATEMENTS MADE BY DEFENDANT DURING CUSTODIAL INTERROGATION."

{¶ 25} Fair's trial counsel filed a motion to suppress the evidence seized from and the statements made by Fair. The motion was withdrawn after Fair and the State stipulated to the lawfulness of Fair's stop and arrest and the admissibility of certain statements made by Fair to Oakwood police officers.

{¶ 26} To reverse a conviction based on ineffective assistance of counsel, an appellant must demonstrate both that trial counsel's conduct fell below an objective standard of reasonableness and that the errors were serious enough to create a reasonable probability that, but for the errors, the result of the trial would have been different. *Strickland v. Washington* (1984), 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Bradley*

(1989), 42 Ohio St.3d 136. Deficient performance means that claimed errors were so serious that the defense attorney was not functioning as the "counsel" that the Sixth Amendment guarantees. *State v. Cook* (1992), 65 Ohio St.3d 516, 524.

{¶ 27} The "failure to file a suppression motion does not constitute per se ineffective assistance of counsel." *State v. Madrigal,* 87 Ohio St.3d 378, 389, 2000-Ohio-448, quoting *Kimmelman v. Morrison* (1986), 477 U.S. 365, 384, 106 S.Ct. 2574, 91 L.Ed.2d 305. Rather, trial counsel's failure to file a motion to suppress constitutes ineffective assistance of counsel only if the failure to file the motion caused the defendant prejudice; that is, when there is a reasonable probability that, had the motion to suppress been filed, it would have been granted. *State v. Howard,* Montgomery App. No. 23795, 2011-Ohio-27, ¶22, citing *State v. Wilson,* Clark App. 08CA0445, 2009-Ohio-2744, ¶11. In the same vein, trial counsel's decision to stipulate to the admissibility of evidence and to withdraw a motion to suppress would constitute ineffective assistance of counsel only if such a decision were prejudicial.

{¶ 28} Fair's assignment of error is confined to the statements that he made at the Oakwood police station. Accordingly, we will likewise limit our discussion to those statements.

{¶ 29} According to Detective Hill's testimony at the suppression hearing, Fair was secured in a holding cell upon being taken to the station by Officer Wilson. When Hill arrived 15 minutes later, he asked Fair for his name, but Fair was uncooperative. Hill explained to Fair that the officers were going to find out who he was and would take him to the Montgomery County Jail for live identification, if necessary. Fair responded, "I'm not

going to tell you anything but my name." Fair provided his name, address, and Social Security number, and he said that he was on parole. Fair repeatedly mumbled obscenities to himself. He also commented that he "should've never went with those guys" or "took that shit." Based on this comment, Detective Hill believed that Fair had direct knowledge of the burglary.

{¶ 30} Detective Hill told Fair that he needed to read him his *Miranda* rights before they spoke further. Hill testified that Fair "wouldn't even allow me to read him his rights" and that Fair "declined totally *** to be *** formally interviewed."

{¶ 31} For the next few minutes, Detective Hill and Officer Wilson chatted amongst themselves. At one point, Hill asked Wilson if he had heard any updates about Lieutenant Benson, who had been taken to the hospital. Fair then stated that he had been "with two guys named Benny Brown and Mike," that they "were driving around and they were doing some stuff," and that he (Fair) "needed money." Detective Hill asked some follow-up questions, such as questions about the type of car they were in, about the altercation with Benson, and about gloves that were found on Fair's person; Fair responded to those questions, but the State did not elicit the exact wording of Fair's response (and these statements were not offered at trial).

{¶ 32} During the conversation, the officers asked Fair if he would be willing to go to the hospital for a voluntary blood draw due to the exchange of blood during the altercation between Fair and Benson. Fair expressed that his ribs were sore. Fair was taken to Kettering Medical Center by Officer Wilson.

{¶ 33} While at the hospital, Fair asked to speak with Detective Hill again. Wilson

notified Hill, who told Wilson to return Fair to the Oakwood station when Fair was released from the hospital. At approximately 6:00 p.m., Officer Wilson and Fair came into the holding cell area. Upon being asked what he wanted, Fair said, "You help me out and I'll help you out." Detective Hill responded to Fair that he (Fair) was on parole, had "100 years on the shelf," had two active felony warrants, and was "facing a bunch of charges" in Oakwood; Hill stated that there was nothing that he could do.

{¶ 34} Fair responded that he "did not commit any burglary" and that he "was with Benny Brown and Mike." Fair stated that he "fences property for them" and that "Benny and Mike steal the property, they give it to [Fair], and [Fair] knows where to get rid of it." Fair indicated that he had "stayed in the car while Benny and Mike committed the burglary." Hill asked Fair additional questions after these statements by Fair and told Fair about the evidence against him, but the prosecutor did not have the detective testify to Fair's responses. Detective Hill made clear that Fair never received *Miranda* warnings.

{¶ 35} At the conclusion of the testimony, the prosecutor informed the trial court that he had "only elicited statements that in our opinion *** would not have violated *Miranda* or the Constitutional rights of the Defendant. *** [T]he State has only elicited such statements that would be spontaneous statements." (Supp. Tr. at p.52) The State repeated that it had brought out only the "specific statements" that it believed to be admissible and "left out the ones that we don't believe *** should come in."

{¶ 36} The parties subsequently stipulated that the following statements were admissible as spontaneous statements: (1) "I'm not going to tell you anything but my name;" (2) "I should have never went with those guys;" (3) "I was with Benny Brown and Mike;"

(4) "They were driving around and they were doing some stuff;" (5) "I needed money;" (6) "You help me out, I'll help you out;" (7) "I did not commit any burglary;" (8) "I was with Benny and Mike, and I fence property for them;" (9) "Benny and Mike steal the property, and they give it to me, and I know how to get rid of it;" and (10) "I stayed in the car, while Benny and Mike committed the burglary."   The stipulation further provided that the other statements made by Fair to police officers on November 21, 2008, were inadmissible.   In exchange for the stipulation, Fair withdrew his motion to suppress.   The prosecutor, Fair's counsel, and Fair signed the stipulation.

{¶ 37} The Fifth Amendment to the United States Constitution provides that "[n]o person *** shall be compelled in any criminal case to be a witness against himself."   "The Fifth Amendment privilege against compulsory self-incrimination 'protects against any disclosures that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used.' "   *Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt Cty.* (2004), 542 U.S. 177, 190, 124 S.Ct. 2451, 159 L.Ed.2d 292, quoting *Kastigar v. United States* (1972), 406 U.S. 441, 445, 92 S.Ct. 1653, 32 L.Ed.2d 212; *Ohio v. Reiner* (2001), 532 U.S. 17, 20, 121 S.Ct. 1252, 149 L.Ed.2d 158.   "The right to *Miranda* warnings is grounded in the Fifth Amendment's prohibition against compelled self-incrimination."   *State v. Strozier*, 172 Ohio App. 3d 780, 786-87, 2007-Ohio-4575, ¶16, citing *Moran v. Burbine* (1986), 475 U.S. 412, 420, 106 S.Ct. 1135, 89 L.Ed.2d 410.

{¶ 38} The first stipulated statement was made by Fair in response to Detective Hill's   attempts to ascertain Fair's name and other identifying information.   A police officer is not required to provide *Miranda* warnings prior to asking "routine booking questions."

*State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, ¶32. "Routine booking questions are questions asked in order 'to secure the biographical data necessary to complete booking or pretrial services.'" Id. at ¶33, quoting *Pennsylvania v. Muniz* (1990), 496 U.S. 582, 601, 110 S.Ct. 2638, 110 L.Ed.2d 528. The first stipulated statement would have been admissible even absent the stipulation.

{¶ 39} According to Hill's testimony at the suppression hearing, the second stipulated statement was volunteered by Fair while Fair was responding to the booking questions. A suspect who volunteers information, and who is not even asked any questions, is not subject to a custodial interrogation and is not entitled to *Miranda* warnings. *State v. McGuire* (1997), 80 Ohio St.3d 390, 401, citing *State v. Roe* (1989), 41 Ohio St.3d 18, 22. In other words, "*Miranda* does not affect the admissibility of '[v]olunteered statements of any kind.'" Id., citing *Miranda,* 384 U.S. at 478; *State v. Montgomery*, 2010-Ohio-5047, ¶15. The third, fourth, and fifth stipulated statements regarding Fair's involvement with Benny and Mike were made by Fair while Hill and Wilson were talking to each other about Benson's being at the hospital. Fair argues that the officers' conversation was the functional equivalent of an interrogation, because it was likely to elicit an incriminating response.

{¶ 40} "'Interrogation' includes express questioning as well as 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *Strozier* at ¶20, quoting *Rhode Island v. Innis* (1980), 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297. "Interrogation" must reflect "a measure of compulsion above

and beyond that inherent in custody itself." *Innis,* 446 U.S. at 300. "Police officers are not responsible for unforeseeable incriminating responses." *State v. Waggoner*, Montgomery App. No. 21245, 2006-Ohio-844, ¶14; *Strozier* at ¶20.

{¶ 41} In *Innis*, the defendant was arrested for an armed robbery involving a shotgun; at the time of his arrest, Innis was unarmed. Innis was given *Miranda* warnings, and he invoked his right to speak with a lawyer. While three officers transported Innis to the police station, one of the officers began talking to another officer regarding the missing shotgun. One of the officers stated that there were "a lot of handicapped children running around in this area" because a school for such children was nearby, and "God forbid one of them might find a weapon with shells and they might hurt themselves." With that, Innis insisted on showing the officers where he had concealed the shotgun. He subsequently moved to suppress that evidence. The trial and appellate courts denied the motion.

{¶ 42} On review, the United States Supreme Court held that the statements the officers made were not ones which they should have known were reasonably likely to elicit an incriminating response. There was no express questioning, and nothing in the record indicated that the officers were aware that the defendant was "particularly susceptible to an appeal to his conscience concerning the safety of handicapped children," or that he was "unusually disoriented or upset" when the statements were made. Though some "subtle compulsion" was present, the Court concluded that the officers' words did not constitute interrogation.

{¶ 43} We are not convinced that Detective Hill and Officer Wilson's casual discussion regarding Benson's physical condition involved a level of compulsion such that

the officers should have known that Fair would likely make an incriminating remark in response. Nothing in the record suggests that the officers emphasized the seriousness of Benson's injuries and took advantage of a known susceptibility, such that Fair would have been compelled to respond.

{¶ 44} Nevertheless, even assuming that Detective Hill and Officer Wilson should have known that their conversation was likely to elicit an incriminating response from Fair regarding the assault, we are not persuaded that Fair's statements regarding his activities with Benny and Mike were a reasonably foreseeable response to that conversation. The officers' conversation focused solely on Benson's medical condition. Although Benson's injuries were the product of an altercation with Fair, that conduct was separate and distinct from the burglary about which Fair commented. The officers could not have reasonably expected that Fair would make statements regarding the individuals involved in the burglary, given the topic of the conversation that the officers were having. Under these facts, the stipulated statements made at the station during the officers' conversation were spontaneous and volunteered responses. See *State v. Thompson*, Clark App. No. 07 CA 35, 2008-Ohio-3623, ¶21.

{¶ 45} Finally, we find no *Miranda* violation as to the remaining stipulated statements, which were made after Fair left Kettering Medical Center and returned to the police station. Fair requested the opportunity to speak with Detective Hill again, and Hill's question to Fair asking Fair what he wanted merely acknowledged that Fair had asked to see him (Hill). Stated simply, Fair initiated the conversation and his statement that "You help me out, I'll help you out" was not the product of police questioning. Detective Hill's

response that there was nothing that he (Hill) could do also did not constitute interrogation, and the remaining stipulated statements were unsolicited and spontaneous.

{¶ 46} Accordingly, upon review of the suppression hearing, the statements to which defense counsel had stipulated would have been admissible even without the stipulation. We find no reasonable probability that the quantum of admissible statements would have been different had defense counsel elected not to enter into the stipulation and allowed  the trial court to rule on Fair's suppression motion.  Counsel did not render ineffective assistance by entering into the stipulation with the State.

{¶ 47} The first assignment of error is overruled.

IV

{¶ 48} Fair's third assignment of error states:

{¶ 49} "THE TRIAL COURT ERRED IN PRECLUDING DEFENSE COUNSEL FROM ARGUING TO THE JURY THAT DEFENDANT SHOULD BE CONVICTED RATHER OF A LESSER RELATED OFFENSE."

{¶ 50} In his third assignment of error, Fair claims that the trial court deprived him of his constitutional right to due process when it precluded him from arguing during closing argument that his conduct constituted receiving stolen property, a lesser related charge,[3] but not complicity to commit burglary.

{¶ 51} "The purpose of closing argument is to summarize the evidence at trial." *John F. Bushelman Const., Inc. v. Glacid Group, Inc.* (June 26, 1996), Hamilton App. Nos.

---

[3]Fair acknowledges that receiving stolen property is not a lesser included offense of complicity to commit burglary. Rather, he argues that it is a related, less serious offense.

C-950412, C-950438. Prosecutors and defense counsel are afforded a wide degree of latitude during closing arguments to address what the evidence has shown and what reasonable inferences may be drawn from that evidence. *State v. Black*, 181 Ohio App.3d 821, 2009-Ohio-1629, ¶33, citing *State v. Lott* (1990), 51 Ohio St.3d 160, 165.

{¶ 52} At the conclusion of the State's case, the prosecutor asked the trial court to preclude Fair's counsel from arguing that his conduct constituted receiving stolen property. The prosecutor argued that the jury was faced only with complicity to commit burglary, and the mention of the receiving stolen property charge, of which Fair had already been convicted, would confuse the jury. The State asserted that "by mentioning that other charge, that it's not a receiving stolen property that he's on trial for, implies to the jury that that's what he should have been charged with. And that's misleading the jury. And that would imply to the jury that he should have been charged with something else."

{¶ 53} Fair's counsel countered that he would not go into detail about the definition of receiving stolen property, only that there is a charge of receiving stolen property that is not before the jury. Counsel stated, "But what I would be able to say is, this case is not whether or not Mr. Fair is guilty of receiving stolen property, which is the facts. *** But for me to not mention to the jury that there are two separate and distinct charges, that they are not to deal with receiving stolen property, does not mean I can't mention it for the purpose of folks, this is about complicity. And I think Mr. Fair would be deprived of his rights to a fair trial in this retrial if that issue can't at least be mentioned." Defense counsel emphasized that he was able to contrast receiving stolen property from complicity to commit burglary in the first trial and that trial resulted in a hung jury on the complicity charge.

**{¶ 54}** The trial court granted the State's request, stating: "*** I think for you [defense counsel] to bring up the issue of receiving stolen property at this point is improper and may impinge upon the State's request for a fair trial because the issue is, is he [Fair] guilty of complicity or not. ***"

**{¶ 55}** Defense counsel's theme during closing argument was that the State had failed to provide any evidence that Fair aided and abetted the burglary. He began, stating:

**{¶ 56}** "*** We can sit here and talk about all the things Mr. Fair may or may not have done that day. But you are charged with deciding whether or not the State has proven to you beyond a reasonable doubt that Mr. Fair purposely aided or abetted another in the commission – committing the offense of burglary. That is your charge, ladies and gentleman of the jury.

**{¶ 57}** "So the issue before you is very simple. Did Mark Fair aid and abet those responsible for the burglary of the Maneys' home on November 21, 2008? I'm not going to stand up here and tell you their home wasn't burglarized. It's clear it was. *** But as I also mentioned yesterday, that – what this case is about is determining whether this man is not responsible for burglarizing the house but for aiding or abetting another in the commission of that burglary. ***"

**{¶ 58}** Defense counsel also argued:

**{¶ 59}** "*** [T]hey steal the property, they give it to me, and I know how to get rid of it. He [Fair] fences property. Where's the evidence that he participated in the stealing of it? *** The Maneys were burglarized. He was found with the stuff. Convict. But convict of what? The charge is complicity to convict burglary. That's what."

{¶ 60} "*** He had the stuff on him. He did. That's why he ran. He had to make his profit gone (sic). Does that mean to you that he burglarized their home? That he aided and abetted others in burglarizing their home?

{¶ 61} "*** Yes, you can say that Mr. Fair had the property. Do you know how he got the property? ***"

{¶ 62} Counsel emphasized that there was no physical evidence placing Fair inside the Maneys' home, there was no evidence that Fair assisted the people who went into the home, and Detective Hill had testified that Fair said he was a "fence" for Benny and Mike, who steal the property. Counsel repeatedly asked the jury, rhetorically, where the evidence was that Mr. Fair aided and abetted in the burglary, and he argued that "[t]his is about convicting the right person" and not about convicting Fair just because he was found with the property.

{¶ 63} Upon review of the transcript, we find no prejudicial error with respect to defense counsel's closing argument. Assuming, for sake of argument, that the trial court erred in precluding defense counsel from arguing another specific statutory violation, defense counsel strongly argued that Fair was a "fence" and that his conduct was limited to liquidating property that Benny and Mike had stolen. Counsel emphasized that the State had failed to prove that Fair had aided and abetted the burglary, and that Fair should not be punished for the burglary committed by others. In our view, defense counsel was able to effectively argue that Fair's conduct in possessing the property was distinguishable from complicity to commit burglary.

{¶ 64} The third assignment of error is overruled.

V

{¶ 65} Fair's fourth assignment of error states:

{¶ 66} "MR. FAIR'S CONVICTIONS FOR RECEIVING STOLEN PROPERTY AND COMPLICITY TO BURGLARY SHOULD HAVE BEEN MERGED AT THE CONVICTION LEVEL."

{¶ 67} In his fourth assignment of error, Fair claims that his convictions for complicity to commit burglary and receiving stolen property should have been merged, rather than being merged only for purposes of sentencing, because he could not be convicted both of stealing and receiving the same property. Fair relies upon *Maumee v. Geiger* (1976), 45 Ohio St.2d 238, which held that receiving stolen property and theft were allied offenses of similar import.

{¶ 68} Revised Code 2941.25, Ohio's multiple count statute, provides:

{¶ 69} "(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

{¶ 70} "(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them."

{¶ 71} "R.C. 2941.25 codifies the double jeopardy protections in the federal and Ohio constitutions, which prohibit courts from imposing cumulative or multiple

punishments for the same criminal conduct unless the legislature has expressed an intent to impose them. R.C. 2941.25 expresses the legislature's intent to prohibit multiple convictions for offenses which are allied offenses of similar import per paragraph (A) of that section, unless the conditions of paragraph (B) are also satisfied." *State v. Barker*, 183 Ohio App.3d 414, 2009-Ohio-3511, ¶22, citing *State v. Rance*, 85 Ohio St.3d 632, 1999-Ohio-291, overruled on other grounds by *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314.

{¶ 72} Subsequent to sentencing in this case, the Ohio Supreme Court clarified the process by which courts determine whether offenses are allied offenses of similar import. *Johnson*, supra. The *Johnson* court overruled *Rance* "to the extent that it calls for a comparison of statutory elements solely in the abstract under R.C. 2941.25." *Johnson* at ¶44. Now, "[w]hen determining whether two offenses are allied offenses of similar import subject to merger under R.C. 2941.25, the conduct of the accused must be considered." Id.

{¶ 73} *Johnson* states that "the intent of the General Assembly is controlling." Id. at ¶46. "We determine the General Assembly's intent by applying R.C. 2941.25, which expressly instructs courts to consider the offenses at issue in light of the defendant's conduct." Id. The trial court must determine prior to sentencing whether the offenses were committed by the same conduct. The court no longer must perform any hypothetical or abstract comparison of the offenses at issue in order to conclude that the offenses are subject to merger. Id. at ¶47 "In determining whether offenses are allied offenses of similar import under R.C. 2941.25(A), the question is whether it is possible to commit one offense *and* commit the other with the same conduct, not whether it is possible to commit one

*without* committing the other. If the offenses correspond to such a degree that the conduct of the defendant constituting commission of one offense constitutes commission of the other, then the offenses are of similar import." Id. at ¶48 (internal citation omitted).

{¶ 74} "If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., 'a single act, committed with a single state of mind.'" Id. at ¶49 (citation omitted). "If the answer to both questions is yes, then the offenses are allied offenses of similar import and will be merged." Id. at ¶50. "Conversely, if the court determines that the commission of one offense will *never* result in the commission of the other, or if the offenses are committed separately, or if the defendant has separate animus for each offense, then, according to R.C. 2941.25(B), the offenses will not merge." Id. at ¶51.

{¶ 75} When two or more offenses must be merged as allied offenses of similar import, the prosecutor must elect which offense it will pursue. *State v. Harris*, 122 Ohio St.3d 373, 2009-Ohio-3323, ¶21-23; *State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, ¶25. "[A] trial court must merge the crimes into a single conviction and impose a sentence that is appropriate for the offense chosen for sentencing." *State v. Damron*, _____ Ohio St.3d _____, 2011-Ohio-2268, ¶17, citing *State v. Brown,* 119 Ohio St.3d 447, 2008-Ohio-4569, ¶41-43.

{¶ 76} At sentencing, the State conceded that Fair's burglary and receiving stolen property charges were allied offenses of similar import, but the prosecutor did not elect an offense on which Fair should be sentenced. The trial court imposed a five-year prison term for Count I, complicity to commit burglary, and a one year for receiving stolen property.

The court found that "those two charges arise out of the *** the same event and that the receiving could be considered a lesser charge of the *** complicity to commit burglary, so the Court says that those would run concurrent or merge. I believe they would merge. But if they don't, they run concurrent." The court sentenced Fair to one year in prison for assault on a peace officer, to run consecutively to the other counts.

{¶ 77} The court's judgment entry differs somewhat from the sentence that was orally imposed. The entry provides that Fair was sentenced to five years on Count 1 (complicity to commit burglary). As to receiving stolen property and assault on the peace officer, the entry imposes "a term of one (1) year on counts #2 and 3 which merge into one (1) year term, but shall be served Consecutively to count #1 for a term of (6) years of imprisonment."

{¶ 78} In light of the State's concession to the trial court, we will assume, with the facts before the court, that burglary and receiving stolen property are allied offenses of similar import. Although the trial court also expressed its belief that the two offenses would merge, the court imposed separate sentences for each of the offenses and "merged" two of the sentences. The trial court, in essence, imposed concurrent sentences and, by doing so, failed to properly merge the allied offenses. *Damron* at ¶17. Accordingly, we must remand to the trial court for a new sentencing hearing.

{¶ 79} The Supreme Court has recently provided additional guidance to the trial court as to its obligations upon remand, as follows:

{¶ 80} "A remand for a new sentencing hearing generally anticipates a de novo sentencing hearing. R.C. 2929.19(A). However, a number of discretionary and mandatory

limitations may apply to narrow the scope of a particular resentencing hearing. For example, the parties may stipulate to the sentencing court's considering the record as it stood at the first sentencing hearing. *State v. Mathis,* 109 Ohio St.3d 54, 2006-Ohio-855, 846 N.E.2d 1, ¶37. In a remand based only on an allied-offenses sentencing error, the guilty verdicts underlying a defendant's sentences remain the law of the case and are not subject to review. *Whitfield,* 124 Ohio St.3d 319, 2010-Ohio-2, 922 N.E.2d 182, at ¶26-27. Further, only the sentences for the offenses that were affected by the appealed error are reviewed de novo; the sentences for any offenses that were not affected by the appealed error are not vacated and are not subject to review. *[State v.] Saxon*[, 109 Ohio St.3d 176, 2006-Ohio-1245,] at paragraph three of the syllabus." *State v. Wilson*, _____ Ohio St.3d ____, 2011-Ohio-2669, ¶15.

{¶ 81} The fourth assignment of error is sustained.

VI

{¶ 82} Fair's convictions will be affirmed. Fair's sentence will be reversed, and the matter will be remanded for resentencing.

. . . . . . . . . .

FAIN, J. and HALL, J., concur.


Copies mailed to:

Kirsten A. Brandt
Lynne M. Fleming
Hon. Frances E. McGee