[Cite as *State v. Rednour*, 2013-Ohio-2125.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

STATE OF OHIO

      Plaintiff-Appellee

v.

GARY R. REDNOUR

      Defendant-Appellant

Appellate Case No.    25135

Trial Court Case No.   2010-CR-2728

(Criminal Appeal from
 Common Pleas Court)

. . . . . . . . . . .

# O P I N I O N

Rendered on the 24th day of May, 2013.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by R. LYNN NOTHSTINE, Atty. Reg. No. 0061560, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

MARSHALL G. LACHMAN, Atty. Reg. No. 0076791, 75 N. Pioneer Blvd., Springboro, Ohio 45066
      Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1}     Defendant-Appellant, Gary Rednour, appeals from his conviction and sentence for the murder of Kimberly Paradiso.  Following a jury trial, the trial court merged a Felonious Assault charge with the Murder charge, and sentenced Rednour to fifteen years to life in prison.

{¶ 2}     Rednour contends that the trial court erred in overruling his motion to suppress and his motion for a mistrial.  In addition, Rednour contends that trial counsel rendered ineffective assistance of counsel by failing to lay proper foundations for impeaching a State witness and for challenging inconsistent testimony.  Rednour further maintains that the jury verdict was against the manifest weight of the evidence, and that the State failed to supply sufficient evidence of all elements necessary to support the charges.  Finally, in a supplemental assignment of error, Rednour contends that the trial court erred when it failed to address the imposition of costs in open court, and then included costs in the termination entry.

{¶ 3}     We conclude that the trial court did not err in overruling Rednour's motion to suppress.  Rednour's statements regarding his right to remain silent were ambiguous and did not require the detectives to stop questioning.  In addition, Rednour voluntarily consented to the buccal swab taken for purposes of establishing DNA.

{¶ 4}     We also conclude that the trial court did not abuse its discretion in refusing to grant a mistrial.  Although the jury may have become aware of the death of a prosecutor's relative, the trial court issued a proper curative instruction, and the jury is presumed to have followed the instruction.

{¶ 5}     As a further matter, trial counsel did not render ineffective assistance of counsel, as there was no lapse or error on counsel's part.  The jury verdict was also not against the manifest weight of the evidence.  A review of the record does not indicate that in resolving

conflicts in the evidence, the trier of fact clearly lost its way and created a manifest miscarriage of justice. For the same reasons, the trial court did not err in overruling Rednour's motion for acquittal. After viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

**{¶ 6}** Finally, the trial court did err in imposing court costs in the termination entry, because costs were not discussed at the sentencing hearing. The termination entry also incorrectly imposed a prison sentence and a three-year term of post-release control on the Felonious Assault charge, which had been merged with the Murder conviction during sentencing. Accordingly, the judgment of the trial court will be Affirmed in part, Reversed in part, and Remanded for further proceedings.

## I. Facts and Course of Proceedings

**{¶ 7}** On Sunday, March 14, 2010, several children found a body lying on the ground in the back yard of a deserted house located at 56 Warder Avenue, Dayton, Ohio. The children alerted a neighbor, who called the police. When the police arrived, they found a woman, later identified as Kimberly Paradiso, dressed in a T-shirt and jeans. Paradiso's clothing was damp, and she was not dressed for the weather. Her shirt was also pulled up and slightly disheveled, and her pants button was undone, with the zipper slightly unzipped. Paradiso had facial injuries and some discoloration in the neck area, and was obviously deceased. Her right shoe and shoelace also looked as if they had been burned.

**{¶ 8}** At the time of her death, Paradiso was homeless and had been staying at the

YWCA Battered Women's Shelter in downtown Dayton. Paradiso's YWCA roommate, Kimberly Jones, last saw Paradiso on Friday morning, March 12, at around 10:00 a.m. According to Jones, Paradiso had alcohol abuse problems with which she had been struggling. Paradiso had also told Jones that she was "hanging around" with a male friend. Jones told Paradiso that she was concerned, and that Paradiso should not be meeting her friend in abandoned houses and drinking. Jones additionally told Paradiso that if the friend were buying liquor for her, he would have sexual expectations. She told Paradiso not to go.

{¶ 9} The YWCA has a curfew of 10:30 p.m., and if a resident has three infractions, she is asked to leave the shelter. Paradiso always came in before curfew, but did not come back either Friday or Saturday night. Because of this, Jones expressed concern to the staff.

{¶ 10} Paradiso was also supposed to pick up clothes from her daughter, Timberly, on Friday, March 12, but she never showed up. Timberly was trying to help Paradiso find an apartment and cut ties with an abusive boyfriend, Raymond Robinson, who had been in jail since February 16, 2010, on charges related to an incident involving Paradiso.

{¶ 11} The police did not know Paradiso's identity until Sunday, March 16, when Jones contacted them, after hearing about the incident on the news. After speaking with Jones, detectives went back to the area of 56 Warder Avenue to try and locate witnesses. The detectives encountered some people in an alley who gave them the names of Artis Allen, who lived on Neal Avenue, and Gary Rednour, who had been rehabbing a house on Neal Avenue. Neal Avenue is located close to where the body was found. Detectives were initially not able to speak with Allen, but were able to find a photograph of Rednour and prepare a photo spread.

{¶ 12} Paradiso's autopsy was conducted on Monday, March 17, at around 11:00 a.m.,

with three Dayton police officers (DeBorde, Heiser, and Cornwell) present. The coroner verbalized his findings as he conducted the autopsy. These findings included blunt force trauma, with extensive swelling to the left side of the orbit next to the eye, and abrasions to the lips, consistent with being struck by a hand or fist. The facial injuries had been inflicted when Paradiso was still alive. She had also sustained extensive bruising on the inside of the muscle attached to the skull, which was caused by blunt force trauma of significant force.

{¶ 13} Because Paradiso's shirt was pulled up and her left nipple was bruised, the coroner also examined her for possible sexual assault, including swabbing for DNA. In addition to the other injuries, Paradiso had bruising on her neck and a crush injury to the back of the esophagus, which was consistent with strangulation. The coroner was of the opinion that the cause of death was strangulation, with blunt force head injuries. However, the death certificate, issued on March 17, indicated that the immediate cause of death was pending. The coroner's office does that frequently when it is waiting on additional information, like toxicology.

{¶ 14} Paradiso had abrasions over both shoulder blades, which were consistent with her having been drug or moved on her back after death. Toxicology eventually indicated that Paradiso had a blood alcohol level of .262 grams percent, which was significantly elevated. However, the level of drugs was not high enough to have caused an overdose. The coroner also noted that the findings regarding rigor mortis were consistent with Paradiso having died in the early morning hours of March 13, 2010, or on the night of March 12, 2010.

{¶ 15} When the police showed Artis Allen the photo spread, Allen was able to identify Rednour, whom he had noticed in the neighborhood for about a month before the murder. On Friday, March 12, or Saturday, March 13, Allen had seen Paradiso and Rednour

together at about 10:45 a.m., at Food Time Market, which was about one block from Neal Avenue. Rednour asked Allen for change. In addition, Allen saw the couple again around 4:30 p.m., coming out of a United Dairy Farmers (UDF) store, with beer.

{¶ 16}  On either that Friday or Saturday, Allen's wife woke him up between 10:30 p.m. and midnight, and asked him to shut his car windows, because it was raining. Allen's house was "catty-corner" from 35 Neal Avenue, where Rednour had been working and staying intermittently. As Allen came outside, he could hear people talking at 35 Neal Avenue. When he got where someone could see him, he heard a male voice say "Shh." Allen then went on to roll up his windows. Allen saw a man and woman standing on the porch at 35 Neal Avenue. The man was talking aggressively.

{¶ 17}  After going inside, Allen went up to his son's room, where he could look out the window and see 35 Neal Avenue. He could also see the people on the porch. After satisfying himself that everything was all right, Allen went on to bed. Allen later identified Rednour and Paradiso as the people who were on the porch.

{¶ 18}  After speaking with Allen, the police went to the Food Time Market and spoke with security guard, Joseph McLaughlin. McLaughlin stated that Paradiso had been coming into the store every day for two or three months before her death. There were times that Paradiso came in with a man she called her husband, but for the last month, she had come in with another man. McLaughlin identified this latter man as Rednour.

{¶ 19}  On Friday, March 12, 2010, McLaughlin was working 11:00 a.m. to 8:00 p.m., and he recalled Rednour and Paradiso coming in at least three times that day. The last time he saw them in the store was at about 6:30 p.m. that night. They left together and were heading

toward Neal Avenue. That was the last time McLaughlin saw Rednour, and Rednour never came into the store again.

{¶ 20} On March 17, 2010, Homicide Detective Gaier placed a locator on Rednour, indicating that Rednour was a person with whom the police would like to speak. Rednour was a person of interest, because he was the last person known to have seen Paradiso alive.

{¶ 21} The police located Rednour that day, and brought him to the Safety Building for an interview. The interview began at around 4:15 p.m., and lasted about an hour. It was conducted in a 6' by 6' interview room that was equipped with a table and chairs. Homicide Detective DeBorde and one other officer sat in on the interview. The interview was not videotaped. At that point, the police just knew Rednour was a person of interest in a suspicious death.

{¶ 22} DeBorde read Rednour his rights, which Rednour waived. Rednour gave DeBorde inconsistent stories. Rednour first denied knowing anyone named "Kim." He then stated that he had a lot of girlfriends, but did not recall anyone named Kim. When further questioned about whether he knew anyone named Kim Paradiso, he said he did not think that he did. Finally, when Rednour was shown a picture of Paradiso, he admitted knowing her, and that her name was Kim.

{¶ 23} Rednour indicated that he had last seen Paradiso on Thursday, March 11, 2010, when Paradiso had come over to the house on Neal Avenue. According to Rednour, he walked her to the bus stop that night, and that was the last time that he saw her. Rednour gave the police conflicting accounts of when Paradiso left that night, and also told different versions of where he had been on Friday and Saturday. He also indicated that he and Paradiso were just

acquaintances, and that they had never had sexual contact.

{¶ 24} After about 20 to 25 minutes, the police took a break to regroup. Consistent with his typical procedure, DeBorde asked Rednour if he would submit a DNA sample. DeBorde did not specifically say that Rednour could refuse; he told Rednour that the police could get a court order, and that it is easier when people consent. After this discussion, Rednour let DeBorde take DNA swabs. The interview then continued for about another half hour, during which DeBorde confronted Rednour about some of the inconsistencies in his story. Rednour eventually indicated that he did not wish to speak further, and he was allowed to leave.

{¶ 25} The detectives subsequently spoke to Rednour's employer and girlfriend. In his interview, Rednour had mentioned them as persons he had seen the weekend of the murder. However, the police were unable to obtain any evidence verifying Rednour's whereabouts on Friday and Saturday.

{¶ 26} Subsequently, in May 2010, the coroner formally indicated that the cause of death was blunt force trauma and strangulation. On August 30, 2010, the detectives received the DNA results, which showed that Rednour's saliva was on Paradiso's breast. The police then brought Rednour in for questioning again. Rednour's *Miranda* rights were administered, and Rednour waived his rights.

{¶ 27} Rednour again denied having any sexual relationship with Paradiso, and said that the last time he had seen her was on Thursday evening. The officers did not tell Rednour where his DNA had been found. Rednour was arrested at the end of the interview, and on the way to the jail, made a spontaneous comment that "Kim had been messing with pimples on his back and that could've been possibly a reason why DNA was available." Trial Transcript,

Volume V, p. 556.

{¶ 28}     Between August 31, 2010 and September 8, 2010, Rednour and another inmate, Jason Gentry, were housed in the same wing of the jail.  During that time, Rednour confided details about the murder that had not been released to the public.  Rednour asked questions about DNA, expressed concern about his DNA being under the victim's fingernails, and related the same "pimple-popping" story that he had told the police.  Rednour admitted to Gentry that he had killed Paradiso.  Rednour also told Gentry that Paradiso did not want to have sex, but that he had sex with her anyway.  In addition, Gentry heard Rednour on the telephone with his girlfriend, trying to arrange an alibi, but the girlfriend was not cooperating.

{¶ 29}     After a number of conversations with Rednour, Gentry alerted his family, who called the police.  Gentry then met with Detective Gaier and disclosed what he had been told. Gentry also testified at trial against Rednour.

{¶ 30}     After hearing the testimony, including a videotape of Rednour's second interview, the jury convicted Rednour on charges of Murder and Felonious Assault.  The trial court then sentenced Rednour to eight years for Felonious Assault and fifteen years to life in prison for Murder.  The court merged the offenses, which resulted in a total sentence of fifteen years to life in prison.  Rednour appeals from his conviction and sentence.


## II.  Did the Trial Court Err in Overruling the Motion to Suppress?

{¶ 31}     Rednour's First Assignment of Error is as follows:

The Trial Court Erred in Overruling the Appellant's Motion to Suppress.

{¶ 32}     Under this assignment of error, Rednour contends that the trial court erred in

failing to suppress statements that were made to the police on August 30, 2010. Rednour argues that the police ignored his invocation of the right to remain silent. Rednour further contends that he never properly consented to the seizure of his DNA specimen. We will address these matters separately.

### A. The August 30, 2010 Interrogation

{¶ 33} As a preliminary matter, we note that in ruling on motions to suppress, "the trial court assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses." *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994), citing *State v. Clay*, 34 Ohio St.2d 250, 298 N.E.2d 137 (1972). Accordingly, when we review suppression decisions, "we are bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." *Id.*

{¶ 34} After hearing the evidence at the suppression hearing and viewing the videotape of the August 30, 2010 interrogation, the trial court concluded that Rednour's constitutional rights were not violated because Rednour did not unambiguously articulate that he intended to remain silent or to end the interview. In particular, the trial court focused on the fact that, although Rednour stated that he wanted to stop the interview, he continued to talk. He even talked over police at times.

{¶ 35} In *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), the United States Supreme Court rejected a "per se proscription of indefinite duration" of further

questioning once a person in custody indicates a wish to remain silent. *Id.* at 103. The Court noted that:

> A reasonable and faithful interpretation of the *Miranda* opinion must rest on the intention of the Court in that case to adopt "fully effective means . . . to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored . . . ." 384 U.S., at 479, 86 S.Ct., at 1630. The critical safeguard identified in the passage at issue is a person's "right to cut off questioning." *Id.*, at 474, 86 S.Ct., at 1627. Through the exercise of his option to terminate questioning he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting. We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his "right to cut off questioning" was "scrupulously honored." (Italics supplied.) *Mosley* at 103-104, quoting *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**{¶ 36}** The Supreme Court subsequently held in *Davis v. United States*, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), that "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." (Emphasis in original.) *Id.* at 459. Instead, "the suspect

must unambiguously request counsel." *Id.*

**{¶ 37}** In *State v. Murphy,* 91 Ohio St.3d 516, 747 N.E.2d 765 (2001), the Supreme Court of Ohio concluded that the ruling in *Davis* also applies to the right to remain silent. *Id.* at 520. In this regard, the Supreme Court of Ohio observed that " '[E]very circuit that has addressed the issue squarely has concluded that *Davis* applies to both components of *Miranda*: the right to counsel and the right to remain silent.' " *Id.*, quoting *Bui v. DiPaolo*, 170 F.3d 232, 239 (1st. Cir.1999). The Supreme Court of Ohio also stressed that:

> Although a suspect "need not 'speak with the discrimination of an Oxford don,' " *Davis*, 512 U.S. at 459, 114 S.Ct. at 2355, 129 L.Ed.2d at 371, quoting *id.* at 476, 114 S.Ct. at 2364, 129 L.Ed.2d at 382 (Souter, J., concurring in judgment), a suspect "must articulate his or her desire to remain silent or cut off questioning 'sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be' an invocation of the right to remain silent." *State v. Ross* (1996), 203 Wis.2d 66, 78, 552 N.W.2d 428, 433, quoting *Davis*, 512 U.S. at 459, 114 S.Ct. at 2355, 129 L.Ed.2d at 371; *see, also*, *United States v. Mikell* (C.A.11, 1996), 102 F.3d 470, 476. If the suspect says something that may or may not be an invocation of the right, police may continue to question him; they need not treat the ambiguous statement as an invocation or try to clear up the ambiguity. (Citations omitted.) (Italics supplied.) *Murphy* at 520.

**{¶ 38}** We have listened to the entire videotape of the August 30, 2010 police interview, which begins with Rednour's assertion at the very beginning that he wanted a lawyer

and did not wish to speak with the police. However, the parties stipulated at the suppression hearing that this initial invocation of the right to remain silent was cured by the detectives' actions in explaining Rednour's rights. After the explanation, Rednour signed the waiver form and agreed to speak with the detectives.

{¶ 39} After about 35 minutes of questioning, Rednour indicated that he thought he should "shut his mouth." However, immediately after making this statement, Rednour continued talking freely to the detectives. Next, around the 49-minute mark, Rednour stated that he was "done talking," because the officers had made up their minds. Again, despite having made this statement, Rednour continued freely talking to the officers.

{¶ 40} At around the 52-minute mark in the videotape, Rednour again invoked his right to counsel and to remain silent. The parties also stipulated at the suppression hearing that Rednour had invoked his right to counsel at this latter point, and that no part of the tape after that point could be used at trial, other than for impeachment purposes.

{¶ 41} In *Murphy*, the suspect stated that, "I'm ready to quit talking *and I'm ready to go home, too*." (Emphasis in original.) *Murphy*, 91 Ohio St.3d at 521, 747 N.E.2d 765. The Supreme Court of Ohio concluded that the suspect had not unequivocally asserted his right to remain silent. Instead, the court reasoned that "What appellant appears to have wanted was to be released. Talking to the police was a means to that end; he was trying to persuade them that he was innocent. Thus, his words did not necessarily mean that he wanted to stop talking, no matter what. If the police were not ready to let him go, he may well have wanted to keep trying to persuade them of his innocence." *Id.*

{¶ 42} The same observations apply to the case before us. Rednour's statements

indicate that his desire to stop speaking was based on the fact that the officers did not believe him and appeared to have made up their minds. The context of the discussions that occurred afterward indicate that Rednour continued to attempt to persuade the officers that he was innocent and had nothing to do with the murder. Accordingly, the trial court did not err in concluding that Rednour's statements were ambiguous and did not require the detectives to stop questioning.

## B. The Warrantless Search for DNA Evidence

{¶ 43} "The Fourth and Fourteenth Amendments to the United States Constitution prohibit warrantless searches and seizures. Unless an exception applies, warrantless searches are per se unreasonable." *State v. Cisternino*, 8th Dist. Cuyahoga No. 94674, 2010-Ohio-6027, ¶ 12, citing *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Where the State relies on the consent exemption, it "has the burden of proving that the consent was, in fact, freely and voluntarily given." (Citations and footnote omitted.) *Bumper v. North Carolina*, 391 U.S. 543, 549, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968).

{¶ 44} During the interview on March 17, 2010, Rednour allowed the police to take a buccal swab, which resulted in DNA evidence connecting Rednour to Paradiso's murder. After hearing the evidence, the trial court concluded that Rednour gave tacit consent when he opened his mouth after receiving the request for the swab. The trial court also concluded that Rednour's consent had been given freely and without coercion.

{¶ 45} "[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the

totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Ohio courts have used the following factors to decide whether a defendant's consent to search is voluntary:

> " '(1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.' " *State v. Forrester,* 2d Dist. Greene No. 97-CA-47, 1998 WL 46653, *4 (Feb. 6, 1998), quoting *United States v. Shabazz*, 993 F.2d 431, 438 (5th Cir.1993). (Other citation omitted.) *Accord*, *State v. Black*, 2d Dist. Montgomery No. 23524, 2010-Ohio-2916, ¶ 36-41.

**{¶ 46}** When the swabs were obtained on March 17, 2010, the police were in the early stages of their investigation, and Rednour was one of about a half-dozen people who were interviewed. Rednour was also not in custody at the time, although he was a person of interest in the investigation. No coercive police procedures were used, and the interview was not unduly long. Rednour was also cooperative with the police. Furthermore, while Rednour had been educated only through eight grades, his demeanor, as observed in the later interview that was videotaped, does not demonstrate a lack of intelligence or difficulty in communication or understanding.

**{¶ 47}** The sixth factor involves whether a defendant believes incriminating evidence will be found. Since Rednour claimed in both interviews that he had nothing to do with the crime, one must assume that he did not believe incriminating evidence would be found. Finally,

with respect to Rednour's awareness of his right to refuse to consent, we note that Detective DeBorde stated that his usual routine is to obtain DNA samples from all persons of interest. DeBorde generally tells these individuals that if they do not want to provide a sample, he can get a court order. DeBorde told this to Rednour, and Rednour allowed him to take a sample.

{¶ 48}    In arguing that the consent was not voluntary, Rednour points to an exchange during the second interview, in which he disagreed with DeBorde regarding whether the prior consent to the swabbing was voluntary. Again, we have reviewed the videotape and the exchange does not indicate that the consent was involuntary. When the swabbing procedure was discussed, Rednour acted as if he had not consented, and the detective indicated that Rednour had, in fact, opened his mouth to let the sample be taken. Rednour agreed that he had opened his mouth. Rednour may not have spoken the words, "I consent," but he did allow DeBorde to take the sample, with his ability to refuse having been implied.

{¶ 49}    "When an officer informs a suspect that he will obtain a search warrant if the individual does not consent to a search, this does not necessarily vitiate an otherwise voluntary consent." *State v. Clark,* 2d Dist. Montgomery No. 18314, 2000 WL 1643789, *7 (Nov. 3, 2000), citing *United States v. Salvo,*133 F.3d 943, 954 (6th Cir.1998), and *State v. Clelland,* 83 Ohio App. 3d 474, 481, 615 N.E.2d 276 (4th Dist.1992). We noted in *Clark* that:

> If the officer's statement simply advises the suspect of his precise legal situation, such a "threat" is not coercion. However, this requires the officer to be confident in his assessment that probable cause exists to issue a search warrant. Even if the officer has a good faith expectation that a warrant will issue, if he is wrong, he has thereby misinformed the suspect of a key fact that he relied on in

giving his consent. For this reason, if an officer advises a suspect he will obtain a search warrant if consent is not given, probable cause must exist to obtain that warrant. (Citation omitted.) *Id.*

{¶ 50} In the case before us, DeBorde would have had probable cause to obtain a warrant for a DNA sample, even though the investigation was in an early stage. Probable cause has been defined as follows:

" * * * '[T]he term "probable cause," according to its usual acceptation, means less than evidence which would justify condemnation * * *. It imports a seizure made under circumstances which warrant suspicion' [quoting from *Locke v. United States* (1813), 11 U.S. (7 Cranch) 339, 348, 3 L.Ed. 364]. More recently, we said that 'the quanta * * * of proof' appropriate in ordinary judicial proceedings are inapplicable to the decision to issue a warrant. *Brinegar*, 338 U.S., at 173, 69 S.Ct. at 1309. Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the magistrate's decision. * * * [I]t is clear that '*only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause.*' *Spinelli*, 393 U.S., at 419[, 89 S.Ct. at 590–591]." (Citation omitted.) (Emphasis in original.) *State v. George,* 45 Ohio St.3d 325, 329, 544 N.E.2d 640 (1989), quoting *Illinois v. Gates*, 462 U.S. 213, 235, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

{¶ 51} By the time DeBorde interviewed Rednour, there was a probability that Rednour had committed criminal activity. Although the coroner had not yet issued a final report pending

toxicology, DeBorde had attended the autopsy and knew that the coroner's preliminary findings included blunt force trauma and strangulation. The victim's shirt was also pulled up and her pants were unbuttoned, suggesting some type of sexual assault. In addition, Deborde had interviewed two witnesses who placed Rednour with the victim near the time of her death; in fact, Rednour was the last person known to have seen her alive. Rednour also gave inconsistent stories about his relationship with the victim and his whereabouts, which would have raised suspicion. Under the circumstances, DeBorde would have had probable cause to obtain a warrant for the DNA sample.

{¶ 52} Accordingly, the trial court did not err in concluding that Rednour's consent to the search was voluntary.

{¶ 53} The First Assignment of Error is overruled.

III. Did the Trial Court Err in Overruling the Motion for a Mistrial?

{¶ 54} Rednour's Second Assignment of Error is as follows:

The Trial Court Erred in Overruling Appellant's Motion for a Mistrial.

{¶ 55} Under this assignment of error, Rednour challenges the trial court's decision not to order a mistrial. The motion for mistrial was based on the fact that the jury may have learned on the third day of trial about the death of a prosecutor's step-father. According to Rednour, this caused the jury to feel sympathy toward the State that could not be undone by the limiting instruction the trial court administered.

{¶ 56} "Mistrials need be declared only when the ends of justice so require and a fair trial is no longer possible." (Citations omitted.) *State v. Franklin,* 62 Ohio St.3d 118, 128, 580

N.E.2d 1 (1991).   In addition, "[t]he determination of whether to grant a mistrial is within the sound discretion of the trial court." (Citation omitted.) *State v. Brown,* 100 Ohio St.3d 51, 2003-Ohio-5059, 796 N.E.2d 506, ¶ 42.   The trial court's decision, therefore, will not be reversed unless the court abused its discretion. *Id.*   An abuse of discretion occurs when the trial court has acted arbitrarily, unreasonably, or unconscionably.   (Citations omitted.)   *State v. Adams,*   62 Ohio St.2d 151, 158, 404 N.E.2d 144 (1980).

{¶ 57}   On the third day of trial, at about 2:30 p.m., the State requested a recess for the rest of the day, because the stepfather of one of the prosecutors had passed away.   This request was made out of the jury's presence.   The defense agreed, and the court recessed the case until the next morning.

{¶ 58}   The following morning, defense counsel indicated that his understanding was that information about the death may have been communicated to the jurors.   There was no suggestion that the State had committed misconduct.   Defense counsel moved for a mistrial, due to a concern that the incident may have caused jurors to have sympathy for the State.   The State disagreed, and asked the court to give a curative instruction instead.

{¶ 59}   After considering the matter, the trial court gave a limiting instruction to the jury, stating that the jury must make its decision on the evidence and not upon any sympathy it might feel for any party, witness, or attorney. *See* Trial Transcript, Volume V, p. 492.   In addition, the court asked the jurors to affirm that their duty was to make a decision based on the evidence and the law they received in court. *Id.*

{¶ 60}   Under the circumstances, the trial court did not abuse its discretion in failing to declare a mistrial.   The jury was properly instructed to follow the law and evidence, and "[a] jury

is presumed to follow the instructions, including curative instructions, given it by a trial judge."
(Citations omitted.) *State v. Garner*, 74 Ohio St.3d 49, 59, 656 N.E.2d 623 (1995). The
prospect of the issue affecting the jury was not significant enough to require a mistrial.

{¶ 61} Accordingly, the Second Assignment of Error is overruled.

## IV. Did Defense Counsel Render Ineffective Assistance?

{¶ 62} Rednour's Third Assignment of Error states that:

Appellant Was Denied His Constitutionally Guaranteed Right to Effective
Assistance of Counsel When Trial Counsel Failed to Properly Lay a Foundation
for Impeaching a State's Witness and Properly Challenging the Time-Line of
State's Witnesses.

{¶ 63} Under this assignment of error, Rednour contends that trial counsel was
ineffective during an attempt to impeach the testimony of a witness, Joseph McLaughlin.
Specifically, defense counsel asked Detective Gaier about statements McLaughlin had made,
rather than asking McLaughlin about the point during cross-examination.

{¶ 64} Rednour also argues that defense counsel was ineffective by failing to lay an
evidentiary foundation during cross-examination of key prosecution witnesses, which would
allegedly have established inconsistencies in the timeline of events. According to Rednour, this
failure caused prejudice because the issue of "when" Rednour and Paradiso were seen together
was crucial to the State's case.

{¶ 65} "In order to prevail on a claim of ineffective assistance of counsel, the defendant
must show both deficient performance and resulting prejudice. *Strickland v. Washington*

(1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. Trial counsel is entitled to a strong presumption that his conduct falls within the wide range of effective assistance, and to show deficiency, the defendant must demonstrate that counsel's representation fell below an objective standard of reasonableness. *Id.*" *State v. Matthews,* 189 Ohio App.3d 446, 2010-Ohio-4153, 938 N.E.2d 1099, ¶ 39 (2d Dist.).

{¶ 66} According to the coroner, Paradiso's state of rigor mortis was consistent with Paradiso having died on Saturday, March 13, 2010, during the early morning hours, or on Friday evening, March 12, 2010. At trial, McLaughlin, the security guard at Food Time Market, testified that he had seen Rednour and Paradiso together three times at the store on March 12, 2010, with the last time being around 6:30 p.m.

{¶ 67} Detective Gaier interviewed McLauglin on March 16, 2010. During Gaier's cross-examination, defense counsel asked Gaier if March 12, 2010 were the same date that he had put in his report regarding his interview of McLaughlin. Trial Transcript, Volume VI, p. 725. The State objected on grounds that this was improper impeachment, because the defense failed to lay a foundation with McLaughlin. In response to the objection, defense counsel made the following statement:

> "Your honor, with respect to the impeachment, Mr. McLauglin's
> testimony is what it is.
>
> My issue is more regarding credibility that deals with Detective Gaier's
> recollection of events and corrections (indiscernible) made." *Id.* at p. 726.

{¶ 68} After the trial court sustained the objection, defense counsel moved on to other matters and did not proffer the police report. The police report was not admitted at trial, and

there is no evidence about what the report specifically said. As a result, we have no basis upon which to conclude that the evidence would have been relevant. *See*, *e.g.*, *State v. Payne*, 2d Dist. Greene No. 95-CA-49, 1996 WL 86229, *4 (March 1, 1996) (noting that an appellate court cannot speculate on the content of evidence, where the record is "completely devoid of any indication of the content of the testimony or the documentary evidence * * *." )

{¶ 69} The second ground for the ineffective assistance of counsel claim relates to defense counsel's alleged failure to effectively establish that the evidence linking Paradiso and Rednour was inconsistent and flawed. As was noted, the coroner could not estimate the precise time of death, but stated that the rigor mortis findings were consistent with Paradiso having died in the early morning hours of March 13, 2010, or on the night of March 12, 2010.

{¶ 70} Contrary to her usual practice, Paradiso did not return to her room at the YWCA before curfew, and the last time Paradiso's roommate saw her was on the morning of March 12. The security guard saw Paradiso and Rednour three times on March 12, with the last time being 6:30 p.m. He never saw either Paradiso or Rednour after that – once again, contrary to the usual course of events, as he had seen them both in the store consistently over the past month.

{¶ 71} Artis Allen, who lived across the street from the house where Rednour had been staying, placed both Paradiso and Rednour on the front porch of Rednour's house on the night of either Friday, March 12, or Saturday, March 13, between 10:30 p.m. and midnight. Allen had also seen them both together twice earlier that day, once at Food Time Market, and once at UDF.

{¶ 72} The above testimony is not inconsistent, nor is it flawed. Even if Allen could not pinpoint whether he saw the couple together on Friday or Saturday night, that would not

assist Rednour – because the other evidence indicates that Paradiso was murdered on one of those days. The critical point is that Rednour was the last person seen with Paradiso when she was alive, and there was no dispute about this fact.

{¶ 73} Accordingly, we see no error or lapse on the part of defense counsel's representation. The Third Assignment of Error is overruled.

V. Was the Jury's Verdict Against the

Manifest Weight of the Evidence?

{¶ 74} Rednour's Fourth Assignment of Error states that:

The Jury's Verdicts Should Be Reversed as They Were Against the Manifest Weight of the Evidence.

{¶ 75} Under this assignment of error, Rednour contends that the jury's verdict was against the manifest weight of the evidence, because there allegedly was no evidence to support the verdict.

{¶ 76} "When a conviction is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Hill*, 2d Dist. Montgomery No. 25172, 2013-Ohio-717, ¶ 8, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). "A judgment should be reversed as being against the manifest weight of the evidence 'only in the exceptional case in which the evidence weighs heavily against

the conviction.' " *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 77} We have reviewed the entire record, including the transcript of the jury trial, and do not find that this is the exceptional case in which the evidence weighs heavily against the conviction. As has been stressed, Rednour was the last person seen with Paradiso when she was alive, and the time frames fit within the time that Paradiso was murdered. In addition, Rednour's DNA was found on Paradiso's breast, and is consistent with some type of sexual assault or at the least, with sexual activity. This evidence contradicts Rednour's initial claim that he had no sexual contact with Paradiso. The State also presented the testimony of a jail inmate, who indicated that Rednour had confessed to having had sexual relations with Paradiso against her will, and had also confessed to the murder.

{¶ 78} Rednour contends that testimony from an inmate lacks credibility, but there is no suggestion in the record that the inmate received any special consideration for his testimony; in fact, he testified that he did not. The testimony that lacks credibility belongs to Rednour, as the statements he made to the police were completely contradictory, and are not supported by other evidence in the record.

{¶ 79} Admittedly, there were no direct witnesses to the murder, but that would be true of many other situations as well. The evidence was largely circumstantial. However, the Ohio Supreme Court has stressed that:

Circumstantial evidence and direct evidence inherently possess the same probative value. In some instances certain facts can only be established by circumstantial evidence. Hence, we can discern no reason to continue the

requirement that circumstantial evidence must be irreconcilable with any reasonable theory of an accused's innocence in order to support a finding of guilt. We agree with those courts that have held that an additional instruction on the sufficiency of circumstantial evidence invites confusion and is unwarranted. Since circumstantial evidence and direct evidence are indistinguishable so far as the jury's fact-finding function is concerned, all that is required of the jury is that it weigh all of the evidence, direct and circumstantial, against the standard of proof beyond a reasonable doubt. Nothing more should be required of a factfinder. (Citations omitted.) *State v. Jenks*, 61 Ohio St.3d 259, 272, 574 N.E.2d 492 (1991), superseded on other grounds by constitutional amendment, as stated in *State v. Smith,* 80 Ohio St.3d 89, 103, n. 4, 684 N.E.2d 668 (1997).

**{¶ 80}** In view of the above discussion, the jury did not clearly lose its way and create a manifest miscarriage of justice. Accordingly, the verdict was not against the manifest weight of the evidence, and Rednour's Fourth Assignment of Error is overruled.

VI. Did the State Fail to Supply Sufficient Evidence

as to All Elements Necessary to Sustain the Verdict?

**{¶ 81}** Rednour's Fifth Assignment of Error is as follows:

The Trial Court Erred by Overruling Appellant's Motion for Acquittal Since the State Failed to Supply Sufficient Evidence as to All the Elements Necessary to Support the Charges Against the Defendant.

**{¶ 82}** Under this assignment of error, Rednour contends that the trial court erred in

overruling his motion for acquittal, because there was no credible evidence to support the charges against him. We disagree.

**{¶ 83}** "Sufficiency and manifest-weight challenges are separate and legally distinct determinations." *State v. Hatten*, 186 Ohio App.3d 286, 2010-Ohio-499, 927 N.E.2d 632, ¶ 17 (2d Dist.), citing *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. " 'While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion.' " *Hatten* at ¶ 17, quoting *State v. Adelman*, 9th Dist. Summit No. 18824, 1998 WL 852565, *7 (Dec. 9, 1998).

**{¶ 84}** We noted in *Hatten* that:

A sufficiency-of-the-evidence argument challenges whether the state has presented adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law. *Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541. Under a sufficiency analysis, an appellate court does not make any determinations regarding the credibility of witnesses. "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259,

574 N.E.2d 492, paragraph two of the syllabus. (Citations omitted.) *Hatten* at ¶ 18.

{¶ 85}　Rednour was charged in Count One of the indictment with having caused death to another while committing Felonious Assault in violation of R.C. 2903.11(A)(1). That statute provides, in pertinent part, that "No person shall knowingly * * * [c]ause serious physical harm to another or to another's unborn * * *." Count Two charges Rednour with having knowingly caused serious physical harm to another in violation of the same statute, R.C. 2903.11(A)(1).

{¶ 86}　After viewing the evidence in a light most favorable to the State, we conclude that any rational trier of fact could have found the essential elements of these crimes proven beyond a reasonable doubt. As was noted, the State submitted significant amounts of evidence connecting Rednour to the crime, and Rednour's statements were inconsistent and frankly, gave the appearance of being untruthful. The trial court, therefore, did not err in overruling Rednour's motion for acquittal.

{¶ 87}　Rednour's Fifth Assignment of Error is overruled.

VII.　Did the Trial Court Err in Failing to Address Court Costs?

{¶ 88}　Rednour's Sixth Assignment of Error, filed in a Supplemental Brief, states that:

The Trial Court Erred When It Failed to Address the Imposition of Court Costs in Open Court, and Then Included Court Costs in the Trial Court's Termination Entry.

{¶ 89}　Under this assignment of error, Rednour contends that the trial court erred in imposing costs in its termination entry, because the court failed to address court costs during the

sentencing hearing. The State concedes error in this regard, citing *State v. Dudley*, 2d Dist. Montgomery No. 24408, 2012-Ohio-3844. We agree that error occurred.

{¶ 90}    In *Dudley*, we noted that:

"Although a judge has discretion to waive court costs assessed against an indigent defendant, such a person ordinarily 'must move a trial court to waive payment of costs at the time of sentencing. If the defendant makes such a motion, then the issue is preserved for appeal and will be reviewed under an abuse-of-discretion standard. Otherwise, the issue is waived and costs are *res judicata*.' " *State v. Lunsford*, 193 Ohio App.3d 195, 2011-Ohio-964, 951 N.E.2d 464, ¶ 14 (2d Dist.), quoting *State v. Threatt*, 108 Ohio St.3d 277, 2006-Ohio-905, 843 N.E.2d 164, ¶ 22. "The Ohio Supreme Court has recognized an exception, however, when a trial court fails to mention court costs during a sentencing hearing. A trial court errs in failing to tell a defendant at sentencing that it is imposing court costs." *Id.* at ¶ 15, citing *State v. Joseph*, 125 Ohio St.3d 76, 2010-Ohio-954, 926 N.E.2d 278, ¶ 22. "The error is not harmless because it deprives the defendant of an opportunity to contest the imposition of court costs." *Id.* "Under such circumstances, principles of waiver and res judicata do not apply." (Citation omitted.) (Italics supplied.) *Dudley* at ¶ 9.

{¶ 91}    The trial court imposed court costs in the termination entry, but did not address the matter at the sentencing hearing. As a result, the Sixth or Supplemental Assignment of Error has merit and is sustained. This matter will be remanded for the limited purpose of allowing Rednour to seek a waiver.

**{¶ 92}** We also note, after reviewing the termination entry, that the trial court incorrectly imposed a concurrent eight year prison sentence and three years of post-release control for the Felonious Assault charge contained in Count Two. This was ordered merged with the Murder charge. However, imposition of concurrent sentences fails to merge allied offenses. *State v. Fair*, 2d Dist. Montgomery No. 24120, 2011-Ohio-3330, ¶ 78. Subsequent to merger, only the guilty verdict remains regarding the merged charge. *State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, 922 N.E. 2d 182, ¶ 26-27. The trial court can correct the error on remand at the new sentencing hearing, which will be limited to addressing costs and correction of the merger. *State v. Saxton*, 109 Ohio St.3d 176, 2006-Ohio-1245, 846 N.E.2d 824, paragraph three of the syllabus, and *State v. Wilson*, 129 Ohio St.3d 214, 2011-Ohio-2669, 951 N.E.2d 381, ¶ 15.

## VIII. Conclusion

**{¶ 93}** Rednour's First, Second, Third, Fourth, and Fifth Assignments of Error having been overruled, and the Sixth or Supplemental Assignment of Error having been sustained, the judgment of the trial court is Affirmed in part, is Reversed in part, and is Remanded to the trial court for further proceedings consistent with this opinion.

. . . . . . . . . . . .

FAIN, P.J., concurs.

HALL, J., concurring.

**{¶ 94}** I agree with the reasoning and the conclusions of my colleagues. I write

separately to express my opinion only as to the method to resolve the two errors we have found.

{¶ 95}   With regard to the assessment of court costs in the judgment entry, without having orally announced the imposition of costs at sentencing, thereby depriving the defendant the opportunity to seek a waiver of costs, I believe a recent statutory amendment provides a solution. R.C. 2947.23(C), effective 3-22-2013, provides "The court retains jurisdiction to waive, suspend, or modify the payment of the costs of prosecution, including any costs under section 2947.231 of the Revised Code, at the time of sentencing or at any time thereafter." Accordingly I would remand to allow the trial court to have the defendant submit a written motion for waiver of costs, rather than to require undesirable prisoner transportation.

{¶ 96}   With regard to the prison sentence for the merged felonious assault count, I would vacate that sentence and have the trial court create a new judgment entry so that there will be no misinterpretation by the Ohio Department of Rehabilitation and Corrections.

Copies mailed to:

Mathias H. Heck
R. Lynn Nothstine
Marshall G. Lachman
Hon. Frances E. McGee

Case Name:     *State of Ohio v. Gary R. Rednour*
Case No:              Montgomery App. No. 25135
Panel:                 Fain, Hall, Welbaum
Author:               Jeffrey M. Welbaum
Summary: