[Cite as *State v. Grigley*, 2014-Ohio-3950.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                           :

    Plaintiff-Appellee              :              C.A. CASE NO.    26065

v.                                      :              T.C. NO.    13CR1377

TOMAS GRIGLEY                           :              (Criminal   appeal from
                                                       Common Pleas Court)

    Defendant-Appellant             :

                                        :

. . . . . . . . . .

**O P I N I O N**

Rendered on the _____12th_____ day of _____September_____,
2014.

. . . . . . . . . .

TIFFANY C. ALLEN, Atty. Reg. No. 0089369, Assistant Prosecuting Attorney, 301 W.
Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

ELIZABETH C. SCOTT, Atty. Reg. No. 0076045, 120 W. Second Street, Suite 603,
Dayton, Ohio 45402
    Attorney for Defendant-Appellant

. . . . . . . . . .

FROELICH, P.J.

    **{¶ 1}**   After the trial court overruled his motion to suppress, Tomas Grigley

pled no contest to possession of cocaine (equal to or more than 27 grams, but less than 100 grams), possession of marijuana (equal to or more than 200 grams, but less than 1,000 grams), and having weapons while under disability. The trial court found him guilty, imposed concurrent sentences totaling four years in prison, and suspended Grigley's driver's license for three years.

{¶ 2} Grigley appeals from his convictions, claiming that the trial court erred in denying his motion to suppress. For the following reasons, the trial court's judgment will be affirmed.

I.

{¶ 3} Sergeant Matthew Beavers and Officer John Howard, both of the Dayton Police Department, testified for the State at the suppression hearing. Their testimony established the following facts.

{¶ 4} On May 3, 2013, Sgt. Beavers was working with the Ohio State Highway Patrol's "Operation Shield" task force on a three-day countywide operation. Beavers was assigned to address complaints to the Dayton Police Department's drug hotline by performing a "knock and advise" at hotline complaint and repeat call locations. A "knock and advise" is a procedure whereby police officers, without a search warrant, knock on the door of the residence, advise the occupants that there have been complaints of drug activity, and ask the residents to walk the officers through the home to dispel the complaints. Beavers testified that cooperation by the residents is voluntary.

{¶ 5} At approximately 7:00 p.m., Sgt. Beavers and four other officers went to 516 Pritz Avenue to perform a "knock and advise," based on information from the drug hotline

that a large amount of drugs and weapons were being sold at the residence. Grigley and another man were on the front porch of the residence – a two-story, single-family home – when officers began to arrive. The two men went inside the home.

{¶ 6} Sgt. Beavers and another officer knocked on the front door of the house, while other officers stood in the alley that ran alongside the home. Grigley came to the door and opened it approximately 12 inches. Beavers asked Grigley if he would step outside, because there were large dogs inside the home; Grigley came out. Beavers explained to Grigley why the officers were there, showed Grigley the knock and advise form, filled in Grigley's information, and asked Grigley "if he minded walking [the officers] through the house just to squash the complaint." Grigley agreed and told Beavers that several rooms belonging to his landlord had locks on them and that he (Grigley) had no key. Sgt. Beavers testified that he and Grigley had "a very cordial conversation" and that Grigley was "very cooperative." Beavers denied making any threats or promises or using a show of force to obtain Grigley's compliance.

{¶ 7} Grigley walked Sgt. Beavers and another officer (Officer Williams) through most of the house, including the living room, sitting room, and kitchen on the first floor, and two out of three bedrooms and a bathroom on the second floor. The door to the basement was secured with a combination lock, and the door to the third upstairs bedroom was padlocked. Sgt. Beavers observed marijuana growing materials, some light bulbs used for growing plants, some power converter boxes, and potting soil and fertilizer in an open upstairs bedroom. He testified that the house had an "overwhelming" odor of raw marijuana.

{¶ 8}     After the walk-through, Grigley and the officers went back outside.  Sgt. Beavers talked to Grigley about the odor of marijuana and the items he observed in the house and advised Grigley that it appeared as if a grow operation were being conducted there.  Grigley denied that a grow operation was being operated and stated that he did not know what was in the locked rooms.  Grigley appeared to be "stressed."

{¶ 9}     Sgt. Beavers asked Grigley if the officers could search the house.  When Grigley asked why, Beavers again explained the items and smell that indicated a grow operation in the house.  Grigley sat down on the front steps and spoke with Officer Howard.  Sgt. Beavers walked away and called a sergeant in the drug unit to discuss the house and ask for assistance if they needed to get a search warrant.  While Sgt. Beavers was talking with the other sergeant, Grigley asked Officer Howard what would happen if he did not consent to a search.  Howard responded that "Sgt. Beavers sounds like he's working on getting a search warrant."

{¶ 10}     When Sgt. Beavers returned to Grigley and Officer Howard, Sgt. Beavers again asked if Grigley would consent to a search of the house.  Grigley stated, "Yes, can I call my attorney first?"  The officers permitted Grigley to do so.  Grigley pulled out his phone and "fumbled around with it for * * * 15 seconds maybe" and then put it back in his pocket.  Sgt. Beavers again asked if Grigley would consent to a search of the residence.  Grigley asked if he could call "his people," which he explained as his family.  For safety reasons, Sgt. Beavers did not allow Grigley to call family members and, instead, asked Grigley to hand his phone to Officer Williams.  Grigley complied.  Sgt. Howard again asked Grigley if he would sign a consent-to-search form.  Grigley agreed and advised Beavers that there was a "little bit" of marijuana in the house.

{¶ 11} Officer Howard went to his cruiser, retrieved a consent-to-search form, and instructed Grigley to read it over and ask any questions. Howard told Grigley that, if he agreed to consent, he should print his name at the top and sign at the bottom. Grigley looked at the form for a few minutes, wrote his name at the top, and signed the bottom; Officer Williams signed it as a witness. (Sgt. Beavers observed Grigley read over and execute the form, but Beavers did not sign the form.) Sgt. Beavers asked Grigley if he would mind if the officers damaged the locks on the basement and bedroom doors; Grigley orally gave the officers permission to damage the locks, and it was written on the form.[1] Officer Howard described Grigley as complaint, easy-going, cooperative, and cordial. Howard testified that Grigley signed the consent-to-search form voluntarily, and Howard denied making any threats or coercing Grigley.

{¶ 12} Officers searched the residence. Officer Howard located a bag of cocaine under a couch cushion in the living room. Three large bags of marijuana, a bag of cocaine, a digital scale with cocaine residue, and a spoon with cocaine residue were found in kitchen cabinets. A firearm was located in Grigley's bedroom. Money was "scattered all over" the house. After cutting the lock to the upstairs bedroom, a marijuana grow operation was discovered in that bedroom; the room contained a "little bit of marijuana" that had recently been cultivated. The basement contained a press for compressing powder cocaine or heroin.

---

[1] Sgt. Beavers testified that he was "under the impression that he [Grigley] was lying" about his lack of control over the locked rooms. Beavers testified that Grigley was the only one who lived in the house, Grigley had control over the house, and Grigley could not provide a name or phone number for his landlord. Accepting, for sake of argument, Grigley's statement to the officers that his landlord had locked the third bedroom and the basement, we question whether Grigley had the authority to consent to a search of those rooms. But even if Grigley's consent were invalid, neither party has argued standing in the briefs, and there is no evidence that Grigley had an expectation of privacy in those rooms or that the charged offenses resulted from a search of those two locations.

The search took approximately 30 minutes to complete. Grigley was arrested and given *Miranda* warnings. He did not make any statements.

{¶ 13} At the suppression hearing, Grigley did not testify, but offered the testimony of William Walters, who stated that he was working on a car across the street from Grigley's house at the time of the search. Walters testified, in part, that he heard Grigley say that he wanted to call his attorney and that "the officer snatched the phone out of his [Grigley's] hand." The trial court expressly found that Walters's testimony was not credible.

{¶ 14} Grigley was indicted on possession of cocaine, possession of marijuana, and having weapons while under disability. Grigley moved to suppress the evidence obtained from the search of his residence. After a hearing, the trial court denied the motion, finding that Grigley voluntarily consented to both the walk-through and the search of his home. Grigley later pled no contest to the charges, and the court sentenced him accordingly.

II.

{¶ 15} Grigley appeals from his conviction. His sole assignment of error states: "The court erred when it found Defendant's consent to search was voluntary."

{¶ 16} In ruling on motions to suppress, the trial court "assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses." *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994), citing *State v. Clay*, 34 Ohio St.2d 250, 298 N.E.2d 137 (1972). In reviewing the trial court's ruling, an appellate court must "accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting those facts as true,

we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." *Id.*; *see State v. Griffin*, 2d Dist. Montgomery No. 25431, 2013-Ohio-3036, ¶ 15.

**{¶ 17}** The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment was directed." (Citation omitted.) *Payton v. New York*, 445 U.S. 573, 585, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). "Absent a warrant, police have no greater rights on another's property than any other visitor has." *State v. Peterson*, 173 Ohio App.3d 575, 2007-Ohio-5667, 879 N.E.2d 806, ¶ 17 (2d Dist.). "Under applicable legal standards, the State has the burden of showing the validity of a warrantless search, because warrantless searches are 'per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well delineated exceptions.'" *State v. Hilton*, 2d Dist. Champaign No. 08-CA-18, 2009-Ohio-5744, ¶ 21-22, citing *Xenia v. Wallace*, 37 Ohio St.3d 216, 218, 524 N.E.2d 889 (1988); *State v. Powell*, 2d Dist. Champaign No. 2012 CA 14, 2012-Ohio-5104, ¶ 16.

**{¶ 18}** One exception to the warrant requirement is a search conducted with the resident's consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 249, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *State v. Posey*, 40 Ohio St.3d 420, 427, 534 N.E.2d 61 (1988). For a warrantless search to be valid based on consent, the State must "establish, by clear and convincing evidence, that consent to the search was freely and voluntarily given." *Powell* at ¶ 17, citing *Posey* at 427. "'Consent' that is the product of official intimidation or

harassment is not consent at all. Citizens do not forfeit their constitutional rights when they are coerced to comply with a request that they would prefer to refuse." *Florida v. Bostick*, 501 U.S. 429, 438, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991).

{¶ 19} "[W]hether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth* at 227. "Knowledge of the right to refuse consent is not a prerequisite to establishing voluntary consent, but is a relevant factor to be taken into account. Consent to a search that is obtained by threats or force, or granted only in submission to a claim of lawful authority, is invalid. Such 'lawful authority' is an express or implied false claim by police that they can immediately proceed to make the search in any event." (Citations omitted.) *State v. Sears*, 2d Dist. Montgomery No. 20849, 2005-Ohio-3880, ¶ 37.

{¶ 20} Grigley claims that his consent to search his home was coerced. He states that there were multiple officers on the scene, who advised him that complaints had been made to the drug hotline regarding his house. In his brief, Grigley emphasizes that he asked to contact his attorney before consenting to a search, but he was "never permitted to make any phone calls, and his phone is taken by the police." Grigley further notes that when he asked what would happen if he did not consent, the officers told him that Sgt. Beavers was attempting to get a search warrant.

{¶ 21} Grigley's encounter with the police began as a "knock and advise," which is typically a consensual encounter. This court has recognized "knock and advise" encounters "as a legitimate investigative technique at the home of a suspect or an individual with

information about an investigation*."* *State v. Miller*, 2012-Ohio-5206, 982 N.E.2d 739, ¶ 16 (2d Dist.). A police officer's attempt to conduct a "knock and advise" can become coercive, however, if the officer asserts his authority, refuses to leave, or otherwise makes the people inside feel they cannot refuse to open the door. *Id*.

**{¶ 22}** The suppression hearing testimony established, and the trial court found, that five officers, in marked cruisers and the uniform of the day, went to Grigley's residence. A few officers went down the alley along the side of the house, while Sgt. Beavers and Officer Williams went to the front door. Because of the dogs inside the house, Beavers asked Grigley if he would step outside, and Grigley did. Beavers notified Grigley of the reason for the officers' presence at the house (the drug complaints), showed Grigley the "knock and advise" form, and asked Grigley if he would be willing to allow the officers to walk through the house to dispel the complaints. Grigley agreed to do so. There is no evidence that Sgt. Beavers or any other officer engaged in coercive conduct, express or implicit, to induce Grigley to agree to the walk-through. Sgt. Beavers specifically denied that he had made any threats or promises or used a show of force to obtain Grigley's compliance.

**{¶ 23}** Sgt. Beavers observed evidence of a marijuana grow operation inside the home during the walk-through and, after the walk-through was completed, he repeatedly asked Grigley if he would consent to a search of his home. Grigley continued to be cordial, but appeared "stressed" after the walk-through. Neverthless, there is no evidence that the officers' repeated requests pressured Grigley into signing a consent-to-search form. When Beavers first asked if Grigley would give consent, Grigley asked why the officers wanted to

search. After hearing why the officers wanted to conduct a search of the residence, Grigley asked if he could contact his attorney. The officers permitted Grigley the opportunity to do so, although he never placed a call.

{¶ 24} After Grigley put his phone away, Grigley asked if he could call his "people." Sgt. Beavers denied this request for safety reasons. He explained, "The allegations on the [hotline] call stated that there [were] high-powered weapons in there * * * along with the drugs. That in amongst itself is a safety issue but calling other people over just adds too many bodies, too many dangers to the scenario. Everything was cordial. Everything was low key and quiet at this point. We didn't need family members to come over. * * * We didn't want to create that potential danger with more people being there."

{¶ 25} We do not find that the officers' actions in denying Grigley's request to call his family and in asking Grigley to turn over his cell phone were coercive. At this juncture, the officers had a reasonable articulable suspicion that Grigley was engaged in criminal activity, based on the items they witnessed in the house and the overwhelming odor of raw marijuana. Although the encounter continued to be cordial, Grigley was not free to leave while the police officers investigated. The purpose of an investigatory detention under *Terry* "is to maintain the status quo so that the officer may investigate further as well as for the safety and protection of the officer from physical harm by the person stopped." *State v. Damron*, 2d Dist. Montgomery No. 8703, 1985 WL 7654, *2 (Feb. 20, 1985). Asking Grigley to hand his cell phone to an officer during the investigation reasonably allowed the officers to proceed without the risk that Grigley might contact family members contrary to the officers' instructions. (There is no evidence that the officers searched the contents of

the phone or even suggested that they might search it.)

{¶ 26} Grigley never responded to the officers that he would not allow the search of the residence, and the record does not indicate that Grigley was badgered into consenting. Contrast *In re Parks*, 10th Dist. Franklin No. 04AP-355, 2004-Ohio-6449 (consent to search defendant was involuntarily given where officers had discovered no illegal activity during defendant's detention, officers repeatedly requested to search defendant, and, after defendant refused the request, the officers indicated they could obtain a search warrant, even though the facts would not support one).

{¶ 27} Grigley asked Officer Howard what would happen if he did not consent to a search, and Officer Howard responded that Sgt. Beavers appeared to be working on getting a search warrant. "When an officer informs a suspect that he will obtain a search warrant if the individual does not consent to a search, this does not necessarily vitiate an otherwise voluntary consent." *State v. Clark*, 2d Dist. Montgomery No. 18314, 2000 WL 1643789, *7 (Nov. 3, 2000); *State v. Rednour*, 2d Dist. Montgomery No. 25135, 2013-Ohio-2125, ¶ 49. "If the officer's statement simply advises the suspect of his precise legal situation, such a 'threat' is not coercion. However, * * * if an officer advises a suspect he will obtain a search warrant if consent is not given, probable cause must exist to obtain that warrant." *Id.* Here, the officers had walked through the home, noticed an "overwhelming" odor of raw marijuana, and observed items that indicated a marijuana grow operation. Under these circumstances, Officer Howard's statement to Grigley simply advised Grigley of "his precise legal situation." There is no indication that Howard's statement, in response to Grigley's question, was made to coerce Grigley's consent. Sgt. Beavers and Officer Howard

described their interaction with Grigley as "a very cordial conversation," and they stated that Grigley was "very cooperative."

{¶ 28} Viewing the totality of circumstances, we find no error in the trial court's conclusion that Grigley's consent to the walk-through and the search of his home was voluntarily given.

{¶ 29} Grigley cites to *State v. Ludington*, 7th Dist. Columbiana No. 99 CO 13, 2000 WL 1222227 (Aug. 28, 2000), which held that a defendant's consent to the search of his home was involuntary. In *Ludington*, six officers in "task force" uniform went to the defendant's home upon receiving reports that he was growing marijuana in his home and sought consent to search the house. After informing the defendant's wife of their suspicions, the wife called her husband at work and asked him to come home to address the issue. The police asked the wife to wait outside with them. When defendant arrived home, he was asked for his consent to search the home. The defendant asked what would happened if he refused. A detective responded that he had smelled marijuana in the home and that the police would ask a judge for a search warrant. The defendant consented to the search. The trial court concluded that the State failed to prove that the consent was voluntary, and the Seventh District affirmed.

{¶ 30} In discussing the totality of the circumstances, the Seventh District noted that detectives went to the home with the intent to seek the defendant's consent to search the home in order to discover evidence against him, that the defendant was called home from work, that six officers "wearing task force outfits with identification hanging from their necks and carrying guns" were at the home, that the defendant's wife waited outside for 30

minutes, and that the defendant was not allowed to enter his home. The appellate court further noted that defendant was informed of the reports that he was growing marijuana, but he was not told the source of those complaints (which the court noted were several years old). Finally, the appellate court noted that the defendant was told that, if he refused consent, the officers were prepared to go to a judge with the reports and the allegation that they smelled marijuana; the officers had told the defendant that they had "a pretty good idea that it is in there." The Seventh District concluded, "Considering the number of officers, their characterization of the incriminating evidence, the restriction upon entering the home and other relevant factors mentioned above, we cannot say that the court was incorrect in its assessment of the totality of the circumstances." *Ludington* at *4.

**{¶ 31}** *Ludington* has some factual similarities to this case, but we find it distinguishable in significant respects and unpersuasive. Most notable, there is no indication in this case that Sgt. Beavers or any of the other officers were dressed in tactical gear and displayed weapons. Although five officers were on scene, only two officers went to Grigley's door, and Grigley promptly responded. The record reflects that Grigley voluntarily walked Sgt. Beavers and Officer Williams through his home, which contained indicia of a marijuana grow operation and had a strong odor of raw marijuana. Grigley was permitted to contact his attorney, although it appears that he did not. Finally, we do not find that Officer Howard's indication that the officers were looking into a search warrant was made to coerce consent by Grigley. *Ludington* does not compel us to conclude that Grigley's consent was not voluntarily given, and we find *Ludington* unpersuasive.

**{¶ 32}** Grigley's assignment of error is overruled.

III.

{¶ 33} The trial court's judgment will be affirmed.

. . . . . . . . . .

HALL, J. and WELBAUM, J., concur.

Copies mailed to:

Tiffany C. Allen
Elizabeth C. Scott
Hon. Mary Katherine Huffman